ORAL ARGUMENT NOT YET SCHEDULED

No. 25-1384

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WEST VIRGINIA SURFACE OWNERS' RIGHTS ORGANIZATION; SIERRA CLUB; WEST VIRGINIA RIVERS COALITION, INC.; AND WEST VIRGINIA HIGHLANDS CONSERVANCY
*Petitioners*,

v.

LEE ZELDIN, in his official capacity as Administrator of the Environmental Protection Agency; and AMY VAN BLARCOM-LACKEY, in her official capacity as Regional Administrator for EPA Region III
*Respondents,*

and

STATE OF WEST VIRGINIA; and the WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION
*Intervenors-Respondents.*

Petitioner for Review of Final Action of the
U.S. Environmental Protection Agency

## BRIEF FOR RESPONDENTS

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

CONNER R. HUGGINS
Of Counsel:         Environment and Natural Resources Division
U.S. Department of Justice
CATHERINE CHONG     P.O. Box 7411
ALEC MULLEE         Washington, D.C. 20044
U.S. Environmental Protection   (202) 598-3799
Agency                Conner.huggins@usdoj.gov

i

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................iii

CERTIFICATE OF INTERESTED PERSONS ........................................................ x

STATEMENT ON ORAL ARGUMENT ................................................................. x

INTRODUCTION ................................................................................................- 1 -

STATEMENT OF THE ISSUES.........................................................................- 3 -

STATEMENT OF THE CASE.............................................................................- 4 -

    I.    Underground injection control under the Safe Drinking Water Act...............- 4 -

    II.    EPA's approval of West Virginia's program.................................................- 9 -

SUMMARY OF THE ARGUMENT ..................................................................- 15 -

STANDARD OF REVIEW .................................................................................- 17 -

ARGUMENT .......................................................................................................- 19 -

    I.    Petitioners lack standing. ..............................................................................- 19 -

        A.    Petitioners do not identify any procedure EPA failed to follow and thus have not suffered a procedural injury. ....................................................................- 20 -

        B.    Petitioners have failed to demonstrate an injury-in-fact traceable to the Rule. .........- 23 -

    II.    EPA properly approved West Virginia's carbon sequestration well program..............- 33 -

    III.    EPA reasonably concluded West Virginia's carbon sequestration well regulations are as stringent as the federal regulations. ........................................................- 36 -

        A.    A state's property laws are outside of the scope of what EPA considers when evaluating a state's carbon sequestration well program for primacy...............................- 36 -

        B.    EPA reasonably concluded West Virginia's long-term liability provision was consistent with all federal requirements. ...........................................................- 41 -

        C.    Petitioners misunderstand the impact of incorporating a state's statutes and regulations by reference.................................................................................- 48 -

    IV.    EPA reasonably concluded WVDEP will effectively and lawfully implement its regulatory program.......................................................................................- 49 -

        A.    EPA fully considered WDVEP's Surface Mining Control and Reclamation Act bonding program.........................................................................................- 50 -

        B.    EPA fully considered WVDEP's Office of Oil and Gas's management of its programs. ....................................................................................................- 54 -

CONCLUSION....................................................................................................- 59 -

CERTIFICATE OF COMPLIANCE..................................................................- 1 -

CERTIFICATE OF SERVICE ............................................................................- 2 -

# TABLE OF AUTHORITIES

**Cases**

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004) ................................................................................- 18 -

*Citizens Against Ruining the Env't v. EPA*,
535 F.3d 670 (7th Cir. 2008) ...................................................................- 24 -

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ........................................ - 20 -, - 29 -, - 31 -

*Coll. Loan Corp. v. SLM Corp.*,
396 F.3d 588 (4th Cir. 2005) ...................................................................- 41 -

*Deep S. Ctr. for Env't Just. v. U.S. Env't Prot. Agency*,
138 F.4th 310 (2025) ...................................................... - 29 -, - 32 -

*Defs. of Wildlife v. EPA*,
420 F.3d 946 (9th Cir. 2005) ...................................................................- 21 -

*Evans v. Techs. Applications and Serv. Co.*,
80 F.3d 954 (4th Cir. 1996) .....................................................................- 25 -

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........................................................ - 18 -, - 59 -

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
681 F.3d 581 (4th Cir. 2012) ...................................................................- 52 -

*Ga. Republican Party v. SEC*,
888 F.3d 1198 (11th Cir. 2018) ...............................................................- 24 -

*Goldberg v. Kelly*,
397 U.S. 254 (1970) ................................................................................- 22 -

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ................................................................................- 20 -

*Hydro Res., Inc. v. EPA*,
608 F.3d 1131 (10th Cir. 2010) ...............................................................- 18 -

*Iowa League of Cities v. EPA*,
 711 F.3d 844 (8th Cir. 2013) ..................................................................- 24 -

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ...........................................- 19 -, - 20 -, - 21 -, - 24 -

*Lujan v. Nat'l Wildlife Fed'n*,
 497 U.S. 871 (1990) ..................................................................- 24 -

*Manufactured Hous. Inst. v. EPA*,
 467 F.3d 391 (4th Cir. 2006) ..................................................................- 24 -

*Massachusetts v. EPA*,
 549 U.S. 497 (2007) ..................................................................- 21 -

*Md. Election Integrity, LLC v. Md. State Bd. Of Elections*,
 127 F.4th 534 (4th Cir. 2025) ..................................................................- 29 -

*Mendoza v. Perez*,
 754 F.3d 1002 (D.C. Cir. 2014)..................................................................- 19 -

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ...........................................- 18 -, - 59 -

*Murthy v. Missouri*,
 603 U.S. 43 (2024) ..................................................................- 32 -

*N. Laramie Range All. v. FERC*,
 733 F.3d 1030 (10th Cir. 2013)..................................................................- 24 -

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
 551 U.S. 644 (2007) ..................................................................- 21 -

*Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*,
 991 F.3d 577 (4th Cir. 2021) ..................................................................- 18 -

*Nat'l Family Farm Coal. v. EPA*,
 966 F.3d 893 (9th Cir. 2020)..................................................................- 24 -

*Nat'l Mining Ass'n v. Mine Safety & Health Admin.*,
 116 F.3d 520 (D.C. Cir. 1997)..................................................................- 57 -

*Phigenix Inc. v. ImmunoGen, Inc.*,
845 F.3d 1168 (Fed. Cir. 2017) ....................................................- 24 -

*S.C. Wildlife Fed'n v. Limehouse*,
549 F.3d 324 (4th Cir. 2008) ........................................................- 21 -

*Sheppheard v. Morrisey*,
143 F.4th 232 (4th Cir. 2025) .......................................................- 32 -

*Shrimpers & Fishermen of the RGV v. Tex. Comm'n on Env't Quality*,
968 F.3d 419 (5th Cir. 2020) ........................................................- 24 -

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002) ...........................................- 23 -, - 24 -

*Sierra Club v. EPA*,
793 F.3d 656 (6th Cir. 2015) ........................................................- 24 -

*Sierra Club v. W. Va. Dep't of Env't Prot.*,
64 F.4th 487 (4th Cir. 2023) ..............................................- 52 -, - 53 -

*South Carolina ex rel. Tindal v. Block*,
717 F.2d 874 (4th Cir. 1983) ........................................................- 58 -

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................- 19 -, - 28 -, - 29 -

*Students for Fair Admissions v. President and Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ......................................................................- 20 -

*Sugar Cane Growers Cooperative of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002) .......................................................- 21 -

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ......................................................................- 21 -

*United States v. Johnson*,
617 F.3d 286 (4th Cir. 2010) ........................................................- 25 -

*United States v. Perkins*,
470 F.3d 150 (4th Cir. 2006) ........................................................- 25 -

*Withrow v. Larkin*,
421 U.S. 35 (1975) ..................................................................- 22 -

*XY Planning Network, LLC v. United States SEC*,
963 F.3d 244 (2d Cir. 2020) ...................................................- 24 -

**Federal Statutes**

5 U.S.C. § 706(2)(A)...............................................................- 18 -

30 U.S.C. § 1201 ....................................................................- 13 -

30 U.S.C. § 1202(a) ................................................................- 13 -

30 U.S.C. § 1259(a) ................................................................- 14 -

42 U.S.C. § 300h-1(b) ...............................................................- 5 -

42 U.S.C. § 300h-1(b)(1) ........................................- 7 -, - 33 -, - 35 -

42 U.S.C. § 300h-1(b)(3) ...........................................................- 6 -

42 U.S.C. § 300h-1(c) ..............................................................- 6 -

42 U.S.C. § 300h-2..........................................................- 6 -, - 33 -

42 U.S.C. § 300h-2(a) ..............................................................- 49 -

42 U.S.C. § 300h-4(a) .......................................................- 8 -, - 54 -

42 U.S.C. § 300h(a)-(b) ............................................................- 5 -

42 U.S.C. § 300i(a) .........................................................- 6 -, - 45 -

42 U.S.C. § 300j-7 ..................................................................- 17 -

42 U.S.C. §§ 300h to 300h-9 ........................................................- 4 -

42 U.S.C. § 300h(b)(1)......................................- 5 -, - 33 -, - 36 -, - 38 -

42 U.S.C. § 300h(d)(2)...........................................- 36 -, - 38 -

**State Statutes**

La. Stat. Ann. § 30:1109 ...........................................................- 41 -

N.D. Cent. Code § 38-22-17 ...................................................................- 41 -

W. Va. Code § 22-6-1 ...........................................................................- 54 -

W. Va. Code § 22-6-2 (2026) ................................................................- 14 -

W. Va. Code § 22-6-7 ...........................................................................- 15 -

W. Va. Code § 22-11A-6(d) ..................................................................- 30 -

W. Va. Code § 22-11B-4(d) .......................................................- 39 -, - 40 -

W. Va. Code § 22-11B-4(d)(4) ..............................................................- 40 -

W. Va. Code § 22-11B-12 ............................................- 41 -, - 43 -, - 47 -

W. Va. Code § 22-11B-12(a) .......................................................- 44 -, - 48 -

W. Va. Code § 22-11B-12(d)(1) ..................................................- 45 -, - 46 -

W. Va. Code § 22-11B-12(e) ..................................................................- 42 -

W. Va. Code § 22-11B-12(e)(5) ..................................................- 47 -, - 48 -

W. Va. Code § 22-11B-12(g) .................................................................- 45 -

W. Va. Code § 22-11B-18 .....................................................................- 30 -

W. Va. Code § 22-11B-19 ...........................................- 31 -, - 32 -, - 37 -

Wyo. Stat. Ann. § 35-11-319 ................................................................- 41 -

**Rules**

Federal Rule of Civil Procedure 56(c)(4) ..............................................- 24 -

**Federal Regulations**

40 C.F.R. pt. 145 ..........................................................................- 7 -, - 8 -

40 C.F.R. pt. 146 .....................................................................................- 4 -

40 C.F.R. pt. 146, subpt. H. ....................................................................- 7 -

40 C.F.R. § 1.25(e)(1) .............................................................................- 38 -

40 C.F.R. § 144.12(a)..................................................- 36 -, - 38 -

40 C.F.R. § 144.12(e)..................................................- 45 -

40 C.F.R. § 144.35......................................................- 37 -, - 39 -

40 C.F.R. § 144.6.......................................................- 4 -

40 C.F.R. § 144.6(b)...................................................- 5 -

40 C.F.R. § 144.6(f)...................................................- 4 -

40 C.F.R. § 144.8.......................................................- 12 -

40 C.F.R. § 145.1(g)...................................................- 33 -

40 C.F.R. § 145.11......................................................- 7 -, - 33 -

40 C.F.R. § 145.11(b)(1)..............................................- 7 -

40 C.F.R. § 145.12......................................................- 7 -, - 11 -

40 C.F.R. § 145.13......................................................- 7 -, - 11 -, - 47 -

40 C.F.R. § 145.23......................................................- 10 -

40 C.F.R. § 145.32(b)(1)..............................................- 53 -

40 C.F.R. § 145.32(b)(3)..............................................- 35 -

40 C.F.R. § 146.85......................................................- 8 -, - 50 -

40 C.F.R. § 146.91......................................................- 12 -

40 C.F.R. § 146.93......................................................- 43 -

40 C.F.R. § 147.1.......................................................- 6 -

40 C.F.R. § 147.1(e)...................................................- 49 -

40 C.F.R. §§ 145.33–145.34..........................................- 6 -

## State Regulations

W. Va. Code R. § 47-9 (1997).......................................- 10 -

W. Va. Code R. § 47-13-13.9.2. .......................................................- 43 -

W. Va. Code R. § 47-13-13.9.2.c. ....................................................- 43 -

W. Va. Code R. § 47-13-13.9.2.d. ....................................................- 43 -

W. Va. Code R. § 47-13-13.9.3 ........................................................- 43 -

W. Va. Code R. § 47-13-13.9.5 ........................................................- 43 -

W. Va. Code R. § 47-13-13.9.6 ........................................................- 43 -

W. Va. Code R. § 47-13-13.9.7 ........................................................- 43 -

W. Va. Code R. § 47-13-13.9.8 ........................................................- 43 -

W. Va. Code R. § 47-13-14.1.6 ........................................................- 44 -

W. Va. Code R. § 47-13-14.7.7. (2025).............................................- 11 -

W. Va. Code R. § 47-13-14.16.1 ...........................................- 37 -, - 39 -

W. Va. Code R. § 47-13-14.16.2 ...........................................- 37 -, - 39 -

**Other Authorities**

49 Fed. Reg. 20138 (May 11, 1984) ..................................................- 7 -

75 Fed. Reg. 77230 (Dec. 10, 2010)..................................................- 4 -

83 Fed. Reg. 17758 (Apr. 24, 2018) ................................................- 41 -

85 Fed. Reg. 64053 (Oct. 9, 2020)...................................................- 41 -

89 Fed. Reg. 703 (Jan. 5, 2024) ......................................................- 41 -

89 Fed. Reg. 93538 (Nov. 27, 2024) ................................................- 13 -

90 Fed. Reg. 10691 (Feb. 26, 2025) ...................- 1 -, - 7 -, - 15 -, - 21 -

## CERTIFICATE OF INTERESTED PERSONS

Respondents are governmental parties and are not required to furnish a certificate of interested parties under Fourth Circuit Rule 26.1(a)(1)(A).

*/s/ Conner R. Huggins*

## STATEMENT ON ORAL ARGUMENT

Petitioners have requested oral argument. Pet. Br. 53. Respondents likewise request oral argument.

# INTRODUCTION

EPA properly authorized West Virginia to enforce certain underground injection wells under the Safe Drinking Water Act. As part of the Act's cooperative-federalism scheme, Congress gave States the ability to assume primary enforcement responsibility over the federal programs that regulate underground injection wells. EPA laid out a detailed set of requirements that States must meet to obtain this primacy.

When West Virginia applied for primacy over injection wells used for geologic storage of carbon dioxide, EPA thoroughly reviewed West Virginia's application through a full notice-and-comment rulemaking process, considered all relevant information, and upon issuing its approval, fully explained its decision. 90 Fed. Reg. 10691 (Feb. 26, 2025) ("the Rule"). Petitioners' challenges to this Rule fail.

At the outset, Petitioners lack Article III standing for several reasons. First, asserting they suffered a procedural injury, Petitioners attempt to inappropriately avail themselves of a lower threshold to demonstrate standing. This gambit fails because Petitioners do not identify any procedural misstep by EPA in this rulemaking. Instead, Petitioners argue the *substance* of the Rule will someday deprive them of a neutral decisionmaker because they do not believe the West Virginia Department of Environmental Protection ("WVDEP") can be impartial.

Pet. Br. 3-6. This theory is neither procedural nor correct, as the authorization of state oversight is the very purpose of the Act's cooperative federalism provision. Further, Petitioners' asserted injury—a generalized grievance that WVDEP would not make the "right" permitting decisions in the future—is conjectural and hypothetical at best. *Id*. at 5.

Petitioners' merits challenges fare no better. Petitioners' reference to two only tangentially related state laws—a property law and a long-term liability law—does not undermine EPA's approval because both laws apply *regardless* of whether EPA grants the state primacy over carbon sequestration wells. Moreover, the state property law is outside the scope of the applicable federal requirements focused on preventing the endangerment of underground sources of drinking water. And the post-well-closure liability transfer law comes into play only after all of the EPA's regulatory requirements have been met and does not undermine any protections afforded under the Act or EPA's implementing regulations.

Similarly, Petitioners' assertion that West Virginia will not implement the carbon sequestration well program effectively and in accordance with the Act—based on West Virginia's alleged failure to implement three unrelated programs—is misplaced. These other programs have little bearing on how WVDEP will implement the carbon sequestration well program and EPA's determination that WVDEP will effectively implement the carbon sequestration program is supported

by the record. EPA reasonably concluded that WVDEP has adequate capacity and legal authority to meet the minimum federal requirements for primacy over the carbon sequestration well program.

The petition should be denied.

## STATEMENT OF THE ISSUES

1. Whether Petitioners lack Article III standing because they fail to demonstrate any concrete, particularized, and imminent injury traceable to EPA's Rule.

2. Whether EPA reasonably and correctly determined West Virginia's carbon sequestration well program and state regulations comply with the requirements of the Act and implementing regulations regardless of the State's long-term liability transfer provision, which is triggered only after completion of all federal carbon sequestration well requirements, and the State's property law, which allows for so-called "forced-pooling" of pore space interests prior to the carbon sequestration well permitting process.

3. Whether EPA reasonably and correctly determined that West Virginia has shown that it will effectively implement the state's carbon sequestration well primacy program and adequately explained its reasoning for granting the state's application.

# STATEMENT OF THE CASE

## I.     Underground injection control under the Safe Drinking Water Act

Congress enacted the Safe Drinking Water Act to protect the nation's drinking water. Among other things, the Act protects sources of drinking water by regulating wells that inject fluids underground. 42 U.S.C. §§ 300h to 300h-9. Underground injection is when fluids are placed underground by well injection. *Id*. § 300h(d)(1). The underground injection control ("UIC") program consists of six classes of injection wells, with each well class varying based on the type and depth of the injection activity and the potential for that injection activity to result in endangerment of an underground source of drinking water. *See* 40 C.F.R. § 144.6. Each well class is subject to different technical standards and criteria (e.g., construction, operation, testing and monitoring, and closure requirements). 40 C.F.R. pt. 146.

Class VI wells are the subject of this Rule. Class VI wells are used for injection of carbon dioxide into deep subsurface rock formations for long-term storage, referred to as carbon sequestration wells. 40 C.F.R. § 144.6(f); 75 Fed. Reg. 77230, 77233 (Dec. 10, 2010); https://www.epa.gov/uic/class-vi-wells-used-geologic-sequestration-carbon-dioxide [https://perma.cc/F484-5A9C] (last visited March 31, 2026). Carbon sequestration is used as part of carbon capture and

storage for carbon dioxide emissions from industrial sources. 75 Fed. Reg. at 77233.

Many of Petitioners' arguments relate not to carbon sequestration wells, but to Class II wells. Class II wells are used exclusively to inject fluids associated with oil and natural gas production. 40 C.F.R. § 144.6(b). Class II fluids are primarily brines (salt water) that are brought to the surface while producing oil and gas. *Id*.; https://www.epa.gov/uic/class-ii-oil-and-gas-related-injection-wells [https://perma.cc/4ETU-J68F] (last visited March 31, 2026).

The Act operates through cooperative federalism, in which states may supplant the various federal programs under the Act with state programs. The Act directs EPA to establish minimum requirements for state programs that regulate underground injection wells. 42 U.S.C. § 300h(a)-(b). Among the minimum requirements, a state program must prohibit any unpermitted underground injection of fluids and allow injection only if it will not endanger underground drinking water sources. *Id*. § 300h(b)(1). The state program must also include inspection, monitoring, recordkeeping, and reporting requirements as identified by EPA regulation. *Id*.

If a state demonstrates to EPA that its program meets the minimum requirements, EPA approves the program. 42 U.S.C. § 300h-1(b). EPA's approval gives the state primacy over the injection of fluids underground. *Id*. § 300h-

1(b)(3); 90 Fed. Reg. at 10692. For any state without an approved program, EPA must prescribe a federal regulatory program. 42 U.S.C. § 300h-1(c).

Once EPA approves a state program, EPA incorporates by reference the state statutes and regulations that contain requirements applicable to injection well owners or operators. 40 C.F.R. § 147.1. Both EPA and the state can enforce state laws incorporated by reference as well as all permit conditions and denials issued pursuant to such state laws, pursuant to 42 U.S.C. § 300h-2. *Id*. at 147.1(e). If EPA determines that a person in that state is violating a requirement of the state's program, however, EPA must give the state a chance to act before EPA enforces the requirement. *Id*. § 300h-2(a)(1). Even in states with primacy, EPA retains the authority to respond without waiting for the state if EPA determines that contamination of an underground source of drinking water may present an imminent and substantial endangerment to public health. *Id*. § 300i(a). If, in the future, West Virginia's program fails to meet EPA's minimum requirements, then EPA always has the authority to withdraw primacy. 42 U.S.C. § 300h-1(b)(3); 40 C.F.R. §§ 145.33–145.34.

EPA's requirements for carbon sequestration programs include a wide range of safeguards to protect drinking water sources and human health. Owners or operators of carbon sequestration wells must obtain a permit for each well, which requires meeting technical, financial, reporting, and recordkeeping requirements.

90 Fed. Reg. at 10692. The requirements cover the entire life cycle of a well, from the initial siting decision, to well construction and operation, to post-injection monitoring and, ultimately, closure. 90 Fed. Reg. at 10692; *see also* 40 C.F.R. pt. 146, subpt. H.

To gain carbon sequestration well primacy, a state must adopt technical criteria and standards at least as stringent as the federal criteria. 40 C.F.R. § 145.11. A state must also adopt permitting requirements at least as stringent as the federal program. 40 C.F.R. § 145.11(b)(1). The state must meet EPA regulatory requirements for compliance evaluation programs (e.g., inspections, review and evaluation of monitoring reports, and other investigations for possible violations of program or permit requirements) and for enforcement authority. 40 C.F.R. §§ 145.12, 145.13.

EPA regulations establish criteria the Agency considers when assessing whether a state "has adopted… and will implement" a UIC program that meets federal requirements. 42 U.S.C. § 300h-1(b)(1). *see also* 49 Fed. Reg. 20138, 20155 (May 11, 1984) (explaining "that the UIC program was intended by Congress to be implemented by the [s]tates whenever possible."); *see also* JA-[RTC_EPA-HQ-OW-2024-0357-0078_13]. Specifically, the minimum regulatory requirements include requirements for permitting, compliance evaluation, and enforcement authority, among others. 40 C.F.R. pt. 145, subpt. B. EPA regulations

also require a state to have financial responsibility provisions at least as stringent as EPA's provisions. 40 C.F.R. § 146.85. The federal carbon sequestration well program's financial responsibility provisions require that an owner or operator of a well demonstrate and maintain financial responsibility to ensure that they can carry out activities related to closing the well, and remediating carbon sequestration sites during injection or after wells are plugged if needed, so that they do not endanger underground sources of drinking water. *Id.* Additionally, EPA considers the required documents in a state's application, including: a program description explaining how a state will carry out its UIC responsibilities, an attorney general's statement confirming state authority to carry out the program, a memorandum of agreement with EPA setting forth how the state will implement the program, including provisions on the state's compliance monitoring and enforcement program, and the federal regulatory requirements for the compliance evaluation programs and enforcement authority. *See* 40 C.F.R. pt. 145, Subpts. C-D.

By contrast, the Act provides alternative pathways for states to acquire primacy for Class II wells. 42 U.S.C. § 300h-4(a). The Act's Class II requirements provide states with a great deal more discretion to develop Class II UIC programs. *See* Guidance for State Submissions under Section 1425 of the Act, Guidance #19, (Guidance #19) https://www.epa.gov/sites/default/files/2018-08/documents/guidance_19.pdf [https://perma.cc/796K-PFPG].

## II. EPA's approval of West Virginia's program

West Virginia began the process to apply for primacy over the carbon sequestration well program by promulgating state regulations in March 2022. W. V. Code R. § 47-13 (2022). EPA and West Virginia then consulted on the State's forthcoming application over the next two years. JA-[RTC_5]. In May 2024, West Virginia formally submitted an application to add carbon sequestration wells to the State's existing UIC program.

Upon receiving the application, EPA evaluated West Virginia's application and considered whether West Virginia's regulations were as stringent—or more stringent than—the federal requirements. JA-[RTC_5].

Additionally, EPA specifically evaluated the effectiveness of the proposed program. JA-[RTC_2-3, 5-6, 22, 25-26, 34]. EPA reviewed all of the required criteria in West Virginia's primacy application, including the following: West Virginia's carbon sequestration well-related UIC statutes and regulations; a Program Description that explains how the state intends to carry out its carbon sequestration well responsibilities; a State Attorney General's carbon sequestration statement of enforcement authority; and an amended addendum to the existing UIC Memorandum of Agreement between EPA and West Virginia describing the administration, implementation, and enforcement of West Virginia's carbon

sequestration well program. EPA reasonably determined that WVDEP met every criterion. JA-[RTC_22].

EPA reviewed West Virginia's Program Description, including the number, occupations, and general duties of the WVDEP staff who will carry out the carbon sequestration well program. *See* 40 C.F.R. § 145.23. *See* JA-[PD_EPA-HQ-OW-2024-0357-0098_4-6]; *see also* JA-[RTC_24-25]. EPA determined that WVDEP had in-house staff with the relevant subject matter expertise to implement the program in accordance with the applicable federal regulations at 40 C.F.R. Part 146, Subpart H. JA-[RTC_22].

EPA evaluated the financial resources and capabilities available to the program. West Virginia's primacy application includes a detailed estimate of the cost to run the carbon sequestration well program and a breakdown of sources of funding. W. Va. Code R. § 47-9 (1997); *see also* JA-[PD_6-7]; *see also* JA-[RTC_24-25]. For example, WVDEP has regularly received annual federal and state grants to implement its UIC program and expects $1,930,000 in federal grant funds for carbon sequestration well program activities. *See* JA-[RTC_ 27]; *see also* JA-[PD_6].

EPA also considered that West Virginia's financial responsibility regulations require applicants for carbon sequestration well to demonstrate and maintain financial resources necessary to ensure they can perform site closure, and

remediate carbon sequestration sites during injection or after wells are plugged if needed, so that they do not endanger underground sources of drinking water. *See* W. Va. Code R. § 47-13-14.7.7. (2025). This helps ensure that WVDEP will not have to shoulder these costs.

EPA also evaluated WVDEP's compliance evaluation program and enforcement authority against EPA regulatory requirements. 40 C.F.R. §§ 145.12, 145.13. The Program Description and Memorandum of Agreement addendum outline WVDEP's compliance monitoring program, including, for example: on-site inspections of carbon sequestration wells at least semiannually and follow-up inspections as appropriate; review of all required testing and monitoring plans and associated reports; operation of a compliance report tracking system; and investigation of all complaints alleging improper conduct. JA-[PD_12-13, 19-20]; *see also* JA-[MOA_ EPA-HQ-OW-2024-0357-0002_8-9]; *see also* JA-[RTC_24]. The Program Description and Memorandum of Agreement addendum also outline WVDEP's enforcement authorities, such as issuing notices of violation and compliance orders, including with penalties levied in accordance with a penalty matrix that EPA determined was consistent with penalty requirements in 40 C.F.R. § 145.13. JA-[PD_13-14]; *see also* JA-[MOA_9-10]. Further, the Memorandum of Agreement addendum sets forth how WVDEP will ensure public participation in the enforcement process, including investigation of and written responses to all

citizen complaints, and notice and comment on any proposed settlement of an enforcement action. JA-[MOA_9-10]. The Program Description sets forth an inspection strategy with a detailed and systematic approach to conducting carbon sequestration well inspections across the state. JA-[PD_18-23]. As part of this strategy, WVDEP will inspect carbon sequestration well facilities on a semi-annual basis, and, in WVDEP's inspection priority ranking, the potential for drinking water impacts from carbon sequestration wells is given the highest priority. JA-[PD_19-20]. Inspection follow-up will be conducted on a weekly basis, and permittees that do not submit information to show compliance based on inspection requests will be subject to enforcement as needed. JA-[PD_22]. EPA determined that WVDEP has the staff necessary to adequately carry out compliance evaluation and enforcement. JA-[RTC_23]; JA-[PD_19].

EPA further considered that it retains oversight over all states' administration of their UIC programs and regularly communicates with WVDEP. 40 C.F.R. §§ 144.8, 146.91, s*ee* JA-[MOA_1-3, 8-12]. Currently, EPA assists WVDEP with various technical and financial questions about its existing UIC program on a regular basis. JA-[RTC_23, 25]. EPA also conducts semi-annual evaluations of WVDEP's program, including reviewing WVDEP's inspection and enforcement activities. *See, e.g.*, JA-[RTC_23]; *e.g.*, JA-[2023_Grant_Workplan_Review_Report_EPA-HQ-OW-2024-0357-0091]; *e.g.*,

JA-[2022_Grant_Workplan_Review_Report_EPA-HQ-OW-2024-0357-0087].
WVDEP also must continue to meet regularly with EPA to review the UIC
program's commitments and milestones. JA-[RTC_23]. EPA determined these
commitments and requirements regarding oversight as well as EPA's existing
oversight activities would adequately ensure WVDEP would effectively operate a
carbon sequestration well program. JA-[RTC_23].

Following this complete review of West Virginia's carbon sequestration well
primacy application, EPA proposed to approve the application and sought public
comment in November 2024. 89 Fed. Reg. 93538 (Nov. 27, 2024).

EPA received comments from a number of stakeholders, all of which EPA
fully considered before issuing the Rule. As relevant here, commenters argued that
West Virginia's administration of the financial provisions of the Surface Mining
Control and Reclamation Act demonstrated that West Virginia cannot administer
the financial provisions of the carbon sequestration well program. JA-[RTC_25].
Congress enacted the Surface Mining Control and Reclamation Act to provide
protection against environmental degradation from coal mining and to clean up
areas damaged by past coal mining. 30 U.S.C. § 1201, et seq.,; 30 U.S.C. §
1202(a). The Office of Surface Mining Reclamation and Enforcement, within the
United States Department of the Interior, approves and oversees the state program
that West Virginia implements and enforces. The financial responsibility portions

of the Surface and Mining Control and Reclamation Act require a permit applicant to file a performance bond, which ensures the completion of the reclamation plan if the work had to be performed by the regulatory authority in the event of forfeiture. 30 U.S.C. § 1259(a).

As discussed in detail below, EPA considered comments regarding the Surface Mining Control and Reclamation Act's financial responsibility provisions and found that the evidence did not "outweigh the evidence in the record supporting that WVDEP will administer the [carbon sequestration well program] financial responsibility in conformance with its detailed regulatory requirements for financial responsibility." JA-[RTC_25].

Some commenters argued that West Virginia's administration of various programs under WVDEP's Office of Oil and Gas demonstrated that WVDEP could not run the carbon sequestration program. JA-[RTC_22-25, 37]. In West Virginia, WVDEP, through the Office of Oil and Gas, is responsible for regulating and permitting oil and gas production wells which are used to extract oil and gas resources from the subsurface. W. Va. Code § 22-6-2 (2026). The federal injection well program and its state counterparts do not regulate wells that are solely used for oil and gas production (e.g. extraction). JA-[RTC_19, 37]. WVDEP is also authorized to issue UIC permits for Class II injection wells, which are mainly used to inject the wastewater byproducts of oil and gas production wells into the

subsurface. W. Va. Code § 22-6-7. WVDEP's Office of Oil and Gas oversees the Class II injection well program as well. JA-[PD_1]. As discussed in-depth below, EPA considered these comments and ultimately concluded that the information provided in the comments did not undermine the record demonstrating WVDEP's enforcement adequacy and that WVDEP will effectively and lawfully implement the carbon sequestration well program. JA-[RTC_24].

Notably, no commenters asserted that WVDEP cannot be impartial in its implementation of a carbon sequestration well program because of any alleged improper pecuniary interest. *See generally* JA-[RTC].

In February 2025, after considering public comments, EPA approved West Virginia's application for primacy over carbon sequestration wells. 90 Fed. Reg. 10691. The approval was based on EPA's "comprehensive technical and legal evaluation" of West Virginia's application against the federal requirements. *Id*. at 10693.

**SUMMARY OF THE ARGUMENT**

1. Petitioners lack standing. Although Petitioners argue the standard for standing should be relaxed because they assert a procedural injury, this is false. Petitioners identify no procedure EPA failed to follow in promulgating the challenged Rule. Instead, the only injury they claim to suffer based on the future operation of the Rule—West Virginia's authorization to administer its state

program regarding carbon sequestration wells. Moreover, Petitioners have failed their burden to demonstrate this alleged injury. Petitioners claim WVDEP, the state agency tasked with enforcing the state's carbon sequestration well program, cannot be impartial in adjudicating permits because it purportedly has a "pecuniary interest" in carbon sequestration wells. But the declarations Petitioners submit to demonstrate this—based on hearsay recitations of news articles and personal experience with WVDEP *over a decade ago*—cannot meet Petitioner's evidentiary burden. Petitioners' attempt to particularize the purported loss of a neutral decisionmaker also fail. Although they assert a loss of enjoyment of public and private lands due to concerns that WVDEP might in the future make a decision to issue a permit with which they disagree, these allegations are based on highly attenuated chains of possibilities. This is simply too conjectural and does not suffice for Article III standing.

2. Petitioners' arguments on the merits also fail. Petitioners allege that EPA's determination that WVDEP's program is as stringent as the federal program is arbitrary and capricious because of two state laws—a property law and a post-closure liability transfer provision—that are only tangentially related to the State's carbon sequestration well program. But EPA has consistently and reasonably found that a state's property laws are outside of the scope of the UIC program, and therefore they cannot form the basis of an EPA primacy decision. Additionally,

EPA evaluated West Virginia's post-closure liability transfer provision and determined that it is consistent with EPA's carbon sequestration well regulations. And, even though EPA determined in a 2010 rule that EPA does not have authority under the Act to authorize post-closure liability transfers, EPA did not foreclose states from enacting such a provision for the *states* to enforce

3.      Petitioners' other merits argument is equally unavailing. EPA fully considered all record evidence when determining that West Virginia had met the requirements to assume primacy over carbon sequestration wells. Petitioners first assert that EPA because WVDEP has failed to properly administer *other* state programs, including their Surface Mining Control and Reclamation Act bonding program, the Class II UIC program, and oil and gas production wells regulated under state laws. But EPA rigorously evaluated WVDEP's carbon sequestration well primacy application and properly weighed both the State's relevant history and commenters' concerns. EPA reasonably concluded that the issues raised by commenters did not undermine West Virginia's carbon sequestration primacy application and reasonably determined that WVDEP will implement the carbon sequestration well program effectively and lawfully.

**STANDARD OF REVIEW**

Because the Safe Drinking Water Act's judicial review provision does not specify a standard of review, 42 U.S.C. § 300j-7, the Administrative Procedure

Act's standard applies. *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 496 (2004); *Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1145 (10th Cir. 2010). Under the Administrative Procedure Act standard, the Court will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). If the agency has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its decision must be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And "[t]his traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise." Agencies are owed particular deference when exercising its judgment in resolving factual disputes that (1) "implicate substantial agency expertise" and (2) "require the agency to 'balance often-competing interests.'" *Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*, 991 F.3d 577, 583 (4th Cir. 2021). And, a court must be at its most deferential "[w]hen an agency is called upon to make complex predictions within its area of special expertise." *Id.*

**ARGUMENT**

## I.      Petitioners lack standing.

At the outset, this petition should be dismissed because Petitioners lack any injury fairly traceable to EPA's actions and thus cannot demonstrate standing. Although Petitioners attempt to avail themselves of a relaxed standard by claiming they have suffered a procedural injury, this is patently incorrect.[1] Petitioners assert no procedure that EPA failed to follow in promulgating the Rule. Accordingly, no putatively relaxed criteria for standing applies. Moreover, regardless of the standard, Petitioners lack any cognizable injury caused by EPA's action here that is capable of supporting standing.

Article III standing is a "doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). For a plaintiff to have standing to sue, Article III of the Constitution requires three elements: (1) an injury in fact; (2) that is fairly traceable to the defendant; and (3) likely redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). To establish injury in fact, a plaintiff must show

---

[1] Petitioners also assert that the Rule itself is procedural, Pet. Br. 3, but a procedural rule is "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (internal quotation marks omitted). Thus, even if Petitioners were correct, this would simply underscore their lack of standing because *no one's* rights or interests would be affected by the rule.

that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks omitted).

Organizations can demonstrate standing via "representational standing," as Petitioners assert here. Representational standing is a theory in which a specific member is identified who "would otherwise have standing to sue in [his] own right." *Students for Fair Admissions v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The individual members' alleged injuries must meet the same requirements of concreteness, particularity, and actual or imminent harm as any individual plaintiff would need to meet. *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013). As discussed below, Petitioners fail to meet these criteria.

### A. Petitioners do not identify any procedure EPA failed to follow and thus have not suffered a procedural injury.

Petitioners concede that EPA followed all necessary procedural requirements when promulgating the Rule. Accordingly, no relaxation of the criteria to establish standing applies in this case. Although Petitioners frame their purported injury as a procedural injury, this is incorrect. Petitioners' sole purportedly procedural injury is their belief that WVDEP may not be impartial in future adjudication of permits. Pet. Br. 3. But that purported injury is the very

*substance* of the Rule: the effect of the Rule is to give West Virginia primacy over carbon sequestration wells. 90 Fed. Reg. 10691.

It is true that a litigant can enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing," *Lujan*, 504 U.S. at 573 n.8, and where Congress has granted such a procedural right, the normal standards for redressability and immediacy are relaxed, *Massachusetts v. EPA*, 549 U.S. 497, 517-18 (2007). But that is not the case here. As the cases Petitioners themselves cite make clear, a procedural injury is an injury to a statutorily defined procedural right. *See id.* (finding state plaintiff had a procedural right to challenge a denial of a petition for EPA to initiate a rulemaking process as unlawfully withheld); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (respondents alleged a procedural injury due to the inability to file comments on some agency actions); *Sugar Cane Growers Cooperative of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002) (alleging the failure of an agency to engage in required notice-and-comment rulemaking); *Defs. of Wildlife v. EPA*, 420 F.3d 946, 957 (9th Cir. 2005) (plaintiffs alleged procedural harms of statutorily required consultation between two agencies), *rev'd on other grounds sub nom.*, 551 U.S. 644 (2007); *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 328 (4th Cir. 2008) (plaintiffs contended "the Defendants have failed to comply with the procedural requirements of [the act]").

Here, however, Petitioners do not allege the decisionmaker that issued *this* Rule, *i.e.*, EPA, was biased. Rather, they allege the substance of the Rule— granting WVDEP primacy over the carbon sequestration well program—deprives them of a neutral decisionmaker over future permitting and enforcement decisions. Pet. Br. 3-4. ("the immediate procedural injury that results from the Rule is the deprivation of Petitioners of a neutral decisionmaker" by "replac[ing] one regulatory decisionmaker (EPA) in application review and enforcement processes with another (West Virginia)"). That is not a procedural injury

Petitioners cite *Goldberg v. Kelly*, 397 U.S. 254 (1970) and *Withrow v. Larkin*, 421 U.S. 35 (1975) to support the proposition a neutral decisionmaker can be a "procedural right." Pet. Br. 4. But these cases do not pertain to standing, much less whether the purported loss of a neutral decisionmaker in some *future* proceeding can constitute a procedural injury that would relax the standard for standing to challenge a proceeding for which no bias is even alleged.

Petitioners here do not assert EPA failed to follow *any* procedural requirement in the Safe Drinking Water Act, the Administrative Procedure Act, or its implementing regulations and instead take issue with the *substance* of the Rule itself. Therefore, Petitioners cannot avail themselves of any relaxed criteria for standing.

**B. Petitioners have failed to demonstrate an injury-in-fact traceable to the Rule.**

Regardless of whether any relaxed criteria for standing applies, Petitioners have failed to demonstrate standing here. Petitioners' fear that WVDEP will not be a neutral decisionmaker in future permitting decisions is the purported injury-in-fact underpinning their entire standing argument. But Petitioners have failed their burden of production to demonstrate this injury. Moreover, their attempts to personalize that injury to their members—through one declarant's loss of "future use and enjoyment" of a public area because of the psychic harm of knowing "WVDEP, rather than EPA, will be in charge of the decisions regarding carbon storage," Pet. Br. 5 (citation modified), and the second declarant's concerns that WVDEP cannot "be impartial" when overseeing carbon sequestration well applications that may at some point involve the pore space below his property, Pet. Br. 6-7, are no more availing.

**1. Petitioners have failed to produce competent evidence that WVDEP will not be an impartial decisionmaker.**

Petitioners' declarations provide no credible evidence demonstrating WVDEP will not be a neutral decisionmaker. As Petitioners agree, Pet. Br. 7, a petitioner's burden of production to establish standing in an appeal from a final agency action is "the same as that of a plaintiff moving for summary judgment in the district court." *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)

(citation omitted).[2] Consistent with *Lujan*, 504 U.S. at 561, *Sierra Club* required

the petitioner to "submit additional evidence to the court of appeals" when there is

no record evidence sufficient to support standing because standing was not an issue

before the agency. *Id*.

The evidentiary standard for summary judgment in district court cases,

Federal Rule of Civil Procedure 56(c)(4), provides apt guidance by analogy here.

That rule requires a declaration used to support a motion for summary judgment to

be "made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant or declarant is competent to testify on the

matters stated." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)

(rejecting conclusory allegations in an affidavit). A declaration submitted on

---

[2] The Fourth Circuit has not explicitly adopted the "burden of production" standard, but the Court has relied on the D.C. Circuit's decision in *Sierra Club v. EPA*, which uses that standard, to decide jurisdiction. *See Manufactured Hous. Inst. v. EPA*, 467 F.3d 391, 398 (4th Cir. 2006) (citing *Sierra Club*, 292 F.3d at 900-01). In addition to the D.C. Circuit, other Circuits have also adopted the burden of production standard. *See, e.g.*, *XY Planning Network, LLC v. United States SEC*, 963 F.3d 244, 251 (2d Cir. 2020); *Shrimpers & Fishermen of the RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 423 (5th Cir. 2020); *Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 908 (9th Cir. 2020); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1201 (11th Cir. 2018); *Phigenix Inc. v. ImmunoGen, Inc.*, 845 F.3d 1168, 1172 (Fed. Cir. 2017); *Sierra Club v. EPA*, 793 F.3d 656, 662-663 (6th Cir. 2015), *cert. denied sub nom., Ohio v. Sierra Club*, 136 S. Ct. 1491, 194 L. Ed. 2d 586 (2016); *N. Laramie Range All. v. FERC*, 733 F.3d 1030, 1034 (10th Cir. 2013); *Iowa League of Cities v. EPA*, 711 F.3d 844, 869-70 (8th Cir. 2013); *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 675 (7th Cir. 2008).

summary judgment cannot be conclusory or based upon hearsay. *See Evans v. Techs. Applications and Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). Further, a lay person's opinion not based on their personal knowledge is inadmissible as evidence and therefore insufficient to overcome a motion for summary judgment. *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010); *see also United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006).

The declarations by Mr. Doug Wood and Mr. David McMahon, J.D., fail this standard for at least four reasons: 1) they are impermissible lay opinion testimony; 2) they offer legal conclusions; 3) their recitation of information they learned from news articles is hearsay; and 4) their lack of any personal knowledge of *current* operations at WVDEP.

Wood's declaration states he was a non-attorney employee of WVDEP and its predecessor for 33 years, retiring in 2011. Wood Decl. ¶ 3, Dkt. No. 40 at 115. Based on this over-a-decade-old experience working at WVDEP and reading a publicly accessible article (*i.e.*, hearsay), he merely offers his lay opinion that WVDEP is "captured by industry" and his unqualified legal conclusion that the agency therefore cannot be a neutral decisionmaker on future permit applications. Wood Decl. ¶ 10, 18, Dkt. No. 40 at 117, 120. Critically, nothing in Wood's declaration speaks to personal knowledge of the operation of WVDEP today or even in recent history. His more-than-a-decade-old work under a different West

Virginia Governor and WVDEP Cabinet Secretary fails to demonstrate *any* personal knowledge relevant to the assertions he makes. Wood's unqualified legal conclusions, lay opinions, hearsay recitations of articles, and statements regarding WVDEP's operations for which he has no current personal knowledge simply cannot constitute evidence of *anything* much less an injury-in-fact.

McMahon's declaration likewise contains no personal knowledge on which he forms his legal conclusion and lay opinion that WVDEP is not a neutral decisionmaker. His work as a West Virginia Surface Owner's Rights Organization lobbyist and public interest attorney focusing on oil and gas law does not give him personal knowledge of the inner workings of WVDEP today. McMahon Decl. ¶ 1.k, 6-7, Dkt. No. 40 at 210, 211. McMahon's declaration thus also fails to constitute competent evidence of any injury-in-fact.

The only other evidence Petitioners produce to support Wood's and McMahon's opinions that WVDEP is not a neutral decisionmaker are: (1) portions of a Fidelis Mountaineer Gigasystem carbon sequestration well permit application, (2) a West Virginia Department of Commerce lease with Fidelis for pore space at the McClintic Wildlife Management Area, and (3) a news article from April 2025 announcing the leasing of pore space under state parks. Wood Decl., Appendices A-C, Dkt. No. 40 at 122-208. The application and news article constitute hearsay and none of these documents come close to establishing that WVDEP is a biased

decisionmaker. As relevant to Petitioners' standing argument, the most these documents help establish is that the West Virginia *Department of Commerce*—an entirely different agency than WVDEP (the state agency at issue here)—can earn certain payments in connection with a carbon sequestration well project from leasing certain property rights to, presumably, a Fidelis subsidiary or affiliate. Wood Decl., Appendix B, Dkt. No. 40 at 190-204. Nothing in any of these documents and declarations set forth facts and evidence to support the bare allegation that WVDEP is an inherently biased decisionmaker. Because this purported injury underpins the entirety of Petitioners' assertion of an injury-in-fact, Petitioners have failed to demonstrate standing. This petition should be dismissed on this basis alone.

> **2. Petitioners' attempts to particularize the injury-in-fact also fail.**

Even if Petitioners had produced evidence demonstrating WVDEP would be a biased adjudicator of future permit applications (and they have not), their attempts to tie that harm to themselves still would fail. Petitioners attempt to particularize WVDEP's purported lack of impartiality through two members: Wood and McMahon.

Wood is a member of West Virginia Highlands Conservancy and West Virginia Rivers Coalition who lives near and recreates on public land. Pet. Br. 4-5. Petitioners claim his "future use and enjoyment of [the public land] will be

negatively affected knowing that WVDEP, rather than EPA, will be in charge of the decisions regarding carbon storage." *Id.* at 5 (citing Wood Decl. ¶¶ 9, 21–22, Dkt. No. 40 at 117, 120-21).

McMahon is a member of the Petitioner West Virginia Surface Owner's Rights Organization. *Id*. at 6 (citing McMahon Decl. ¶ 1, Dkt. No. 40 at 209-10). McMahon lives *near* a state-owned property whose pore space the state has leased to Fidelis. *Id*. (citing McMahon Decl. ¶¶ 1, 10, 16–17, Dkt. No. 40 at 209-10, 211-12, 217-18). McMahon "does not believe [WVDEP] can be impartial in its oversight of [carbon sequestration well] applications that intend to use pore space in the Kanawha State Forest" and "is reasonably concerned that," in some future permit adjudication, "his pore space under his own property could be forced pooled without his consent." *Id*. (citing McMahon Decl. ¶¶ 1, 11-15, 21, Dkt. No. 40 at 209-10, 212-16, 219). Petitioners thus assert his "use and enjoyment of his property and the Forest are negatively affected knowing that WVDEP, rather than EPA, will be in charge of the decisions regarding carbon storage there." *Id*. at 6-7 (citing McMahon Decl. ¶¶ 22-23, Dkt. No. 40 at 219 (internal quotations omitted)).

1.     Wood's and McMahon's assertions of generalized psychic harm of simply knowing WVDEP would adjudicate any future permitting action is not particularized to them. An injury is "particularized" if it affects the plaintiff "in a personal and individual way," *Spokeo*, 578 U.S. at 339, not if it is alleged as

"generalized grievances, seeking relief that no more benefits the plaintiff than it does the public at large." *Id*. at 352. Their assertions of a general discontent with WVDEP as a decisionmaker, even tied to how it may *one day* affect their own property or public land near them is insufficiently particularized to constitute an injury for standing purposes.

2.     Moreover, Wood's and McMahon's general concern that WVDEP may mismanage the carbon sequestration well program is exactly the kind of concern over future mismanagement of a program this Court has held too conjectural and hypothetical. *Md. Election Integrity, LLC v. Md. State Bd. Of Elections*, 127 F.4th 534, 540 (4th Cir. 2025) (finding the potential that blank ballots might be cast due to the statewide mismanagement of future elections to be conjectural and hypothetical); *see also Clapper*, 568 U.S. at 410 (rejecting standing premised on a "highly speculative" chain of possibilities); *contra* Pet. Br. 4-7.

Indeed, in a case involving EPA's approval of another state's primacy request for carbon sequestration wells, the Fifth Circuit rejected a similarly conjectural chain of events, explaining: "Petitioners' theory requires guesswork all the way down: how Louisiana will act, whether and how EPA might choose to intervene, and whether well operators will, in fact, abandon their substantial investments by deciding not to operate a well after constructing it." *Deep S. Ctr. for Env't Just. v. U.S. Env't Prot. Agency*, 138 F.4th 310, 322 (2025).

The same guesswork is needed here. For Wood's and McMahon's injury to come to fruition the following sequence needs to happen: (1) Fidelis decides to use property near McMahon's property, in Wood's case, where he recreates, (2) WVDEP decides to issue Fidelis a carbon sequestration well permit based on the Department of Commerce's—a *different* state agency's—"pecuniary interest" and contrary to the scientific recommendation from staff, (3) no third party successfully challenges the permit at the state administrative tribunal, (4) the permittee violates its permit and neither WVDEP nor EPA takes corrective action, and, finally, (5) the violation leads to a malfunction which results in an injury to the properties identified by Wood or McMahon. This is simply too speculative to confer standing.

3.    Finally, McMahon's concern that WVDEP's purported impartiality may one day result in it authorizing a permit that could require his pore space to be force-pooled without his consent is both too speculative to constitute an injury and not traceable to the Rule challenged here. Pet. Br. 6.

Pore space is comprised of the pockets of space between underground rocks and soil that can be used as storage space for carbon dioxide or other substances. W. Va. Code § 22-11A-6(d). West Virginia law recognizes surface owners own pore spaces in the subsurface in which carbon dioxide will be stored as part of a carbon sequestration project. W. Va. Code § 22-11B-18. West Virginia also allows

a carbon sequestration project operator who has obtained the consent of at least 75% of the pore space owners required for its carbon sequestration project to obtain an order from the West Virginia Oil and Gas Conservation Commission requiring the pore space owned by the remaining nonconsenting landowners be included in a carbon sequestration storage project. W. Va. Code § 22-11B-19.

For McMahon's forced-pooling injury to come to fruition, multiple actions by third parties not before this Court would need to occur: (1) Fidelis must add more leases to the project near McMahon's land to enable the "forced pooling," [3] and (2) the Oil and Gas Conservation Commission must approve Fidelis' application to forcibly pool McMahon's pore space rights. And by his own admission, McMahon may actually benefit from this turn of events. McMahon Decl. ¶ 1, Dkt. No. 40 at 209-10 ("my pore space may be affected or even force pooled into a carbon sequestration project with the Forest lease which would *financially benefit me* more or less *if done right* or wrong" (emphasis added)). This is simply too speculative to constitute an injury-in-fact. *Clapper*, 568 U.S. at 410.

Additionally, any pooling injury is not traceable to the challenged Rule. West Virginia's statute authorizing pooling exists *regardless* of whether EPA or

---

[3] It is not clear that McMahon's property is even eligible to be forcibly pooled. By his own admission, Fidelis would have to lease more land in addition to the current Kanawha State Forest lease and add additional pore space owners for them to be able to force pool McMahon. McMahon Decl. ¶ 13 n.7, Dkt. No. 40 at 214.

West Virginia administer this program and is dependent on other parties' actions. W. Va. Code § 22-11B-19. As this Court has explained, the "traceability" element of standing "is not met when an injury results from 'the independent action of some third party not before the court.'" *Sheppheard v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025). The traceability "requirement serves 'to ensure that in fact, the asserted injury was the consequence of' EPA's grant of primacy." *Deep South*, 138 F.4th at 326 (quoting *Murthy v. Missouri*, 603 U.S. 43, 68 n.8 (2024)). Here, McMahon's alleged injury would stem from West Virginia legislature enacting W. Va. Code § 22-11B-19, not EPA's Rule challenged here.

Moreover, McMahon's concerns regarding pooling are not redressable by this Court. "An injury is not redressable if the court is 'powerless to provide the very relief' the plaintiff requests." *Sheppheard*, 143 F.4th at 243. Even if EPA were the regulatory authority, Fidelis could still forcibly pool McMahon's land because the provision enabling forced pooling is an operation of state law unrelated to EPA's carbon sequestration well regulations or whether EPA or WVDEP regulate carbon sequestration wells. W. Va. Code § 22-11B-19. Thus, McMahon's concern is not redressable through this case.

In short, this case can begin and end with standing. Petitioners simply have failed to demonstrate any injury-in-fact traceable to EPA's action and redressable by this Court. The petition thus should be dismissed.

**II.     EPA properly approved West Virginia's carbon sequestration well program.**

EPA fully considered WVDEP's application, all comments, and all information in the record and reasonably concluded West Virginia's carbon sequestration well program meets the "minimum requirements" for approval. 42 U.S.C. §§ 300h(b)(1), 300h-1(b)(1). EPA rigorously evaluated WVDEP's proposed carbon sequestration well program in close coordination with WVDEP for over two years. JA-[RTC_5]. The final primacy application reflects as much, incorporating EPA's recommendations. JA-[RTC_12].

To be approved for UIC primacy, states must adopt UIC permitting regulations at least as stringent as EPA's UIC permitting regulations, 40 C.F.R. § 145.11, as well as technical criteria and standards as stringent as those set forth in 40 C.F.R. part 146. EPA regulations make clear they do not preclude a state from "[a]dopting or enforcing requirements which are more stringent or more extensive than those required" by EPA regulations, or from "[o]perating a program with a greater scope of coverage than that required" by EPA regulations. 40 C.F.R. § 145.1(g). At the same time, "[w]here an approved [s]tate program has a greater scope of coverage than required by Federal law the additional coverage is not part of the federally approved program." *Id*. EPA only enforces those provisions that have a counterpart in the Act and implementing regulations and are properly within the scope of the federal UIC program. 42 U.S.C. § 300h-2.

- 33 -

EPA conducted a thorough review of West Virginia's carbon sequestration well primacy application, including confirming that West Virginia's applicable state statutes and regulations are as stringent as EPA's corresponding regulations, by performing an extensive, line-by-line comparison of West Virginia's carbon sequestration well-related statutes and regulations. JA-[RTC_5].

Additionally, EPA specifically evaluated the effectiveness of the proposed program. JA-[RTC_2-3, 5-6, 22, 25-26]. As discussed *supra*, EPA evaluated West Virginia's primacy application, including the Program Description explaining how WVDEP intends to carry out its carbon sequestration well responsibilities and an addendum to the existing UIC Memorandum of Agreement between EPA and West Virginia describing the administration, implementation, and enforcement of West Virginia's carbon sequestration well program. EPA determined WVDEP's in-house staff covered the relevant specialties to effectively implement the program, including site characterization, modeling, well construction, testing and monitoring, financial responsibility, and regulatory and risk analysis. *See* JA-[PD_2]. Additionally, WVDEP will have access to contractor support for site characterization, modeling, well construction and testing, and risk analysis. *Id*.

EPA also evaluated the financial resources and capabilities available to the program, as discussed *supra*, including West Virginia's funding sources and financial regulatory requirements for owners and operators. WVDEP's staff also

includes an employee with a postgraduate diploma in Business Management and a master's degree in accountancy who will review the cost estimates provided by applicants to verify that they are sufficient to cover the required activities. JA-[PD_6].

Further, discussed in detail *supra*, EPA evaluated WVDEP's compliance evaluation program and enforcement authority and determined that WVDEP met all EPA requirements. JA-[RTC_5-6]. While all the evidence thoroughly demonstrates that WVDEP will implement its carbon sequestration well program, as added assurance, EPA retains oversight over WVDEP's administration of its program. For example, EPA regularly communicates with WVDEP, reviews quarterly reporting by WVDEP, conducts semi-annual evaluations of WVDEP's inspection and enforcement activities, and assists with various technical and financial questions. *See* JA-[MOA_1, 8-12]; JA-[RTC_23, 25].

Thus, after thoroughly reviewing West Virginia's carbon sequestration well primacy application, EPA reasonably concluded that West Virginia's permitting regulations and technical standards are as stringent as EPA's and that West Virginia will effectively implement the carbon sequestration well program in accordance with the requirements of the Act and EPA's regulations at 40 C.F.R. parts 124, 144-146. On that basis, EPA reasonably approved West Virginia's carbon sequestration well primacy application. 42 U.S.C. § 300h-1(b)(1); 40

C.F.R. § 145.32(b)(3).

**III.      EPA reasonably concluded West Virginia's carbon sequestration well regulations are as stringent as the federal regulations.**

Petitioners argue two West Virginia laws make the State's carbon sequestration well program less stringent than EPA's program: (1) a property law concerning pore space issues, and (2) a post-closure liability transfer law. But neither state law makes West Virginia's program less stringent than EPA's program, as discussed below.

**A.      A state's property laws are outside of the scope of what EPA considers when evaluating a state's carbon sequestration well program for primacy.**

When evaluating a state's carbon sequestration well program, EPA thoroughly evaluates the state's carbon sequestration well permitting statutes and regulations and technical standards to ensure they are as stringent as EPA's. But the UIC program is only concerned with whether underground injection endangers underground sources of drinking water. 42 U.S.C. § 300h(b)(1) & (d)(2); 40 C.F.R. § 144.12(a). The pore space rights of a UIC permit applicant do not impact the UIC permitting authority's analysis of whether the proposed injection may endanger underground sources of drinking water and thus have no bearing on whether a state program is as stringent as EPA's.

Because issues of property rights are outside of the purview of the Safe Drinking Water Act, EPA's UIC permitting regulations state the issuance of a UIC

permit does not convey any property rights or authorize any injury to persons or invasion of other private rights. 40 C.F.R. § 144.35. West Virginia's UIC regulations specify the same limitations. W. Va. Code R. § 47-13-14.16.1 ("The issuance of a permit does not convey any property rights of any sort, or any exclusive privilege."); *see also id*. § 14.16.2 ("The issuance of a permit does not authorize any injury to persons or property or invasion of other private rights"). Thus, West Virginia's UIC permits likewise do not convey any property rights or authorize any injury to person or invasion of other private rights.

Petitioners attempt to argue three West Virginia laws regarding property rights undermine the stringency of its carbon sequestration well program. But EPA's stringency analysis relates to substantive requirements to safeguard drinking water, not a state's property laws. And, because state property laws exist and apply *regardless* of whether EPA or WVDEP administer West Virginia's UIC program, all three state property laws Petitioners cite are irrelevant to the challenged Rule.

1.      Petitioners first point to a West Virginia law entirely separate from the UIC permitting process that authorizes "pooling" of pore space rights in certain circumstances. Pet. Br. 37 (citing W. Va. Code § 22-11B-19). Petitioners argue the Oil and Gas Conservation Commission's order would constitute a physical taking of the nonconsenting landowners' property, which they refer to as "forced pool[ing]." Pet. Br. 6.

Notably, this law is separate from the UIC permitting process, is not incorporated into EPA's regulations, and has nothing to do with whether West Virginia should have primacy over the carbons sequestration well program. Even if EPA remained the regulatory authority over the carbon sequestration well program, this "forced-pooling" provision would still be operable because EPA's requirements do not override state property laws. How West Virgina deals with property rights and eminent domain it may exercise are outside the scope of a carbon sequestration well primacy approval decision. JA-[RTC_35].

As a corollary, when a state does not have primacy over a UIC program and EPA remains the permitting authority, EPA's adjudicative body, the Environmental Appeals Board, has consistently found that evaluation of parties' property rights are outside of the scope of the UIC permitting process. JA-[RTC_35-36]; *see also* 40 C.F.R. § 1.25(e)(1) (establishing the Environmental Appeals Board).

In short, the UIC program is only concerned with whether an underground injection endangers underground sources of drinking water. 42 U.S.C. §§ 300h(b)(1), (d)(2); 40 C.F.R. § 144.12(a). Whether the permit applicant has the necessary pore space rights has no impact on the UIC permitting authority's analysis of whether the proposed injection may endanger underground sources of drinking water. Thus, these pore space ownership provisions at issue shed no light

on whether EPA properly determined West Virginia's carbon sequestration well program meets federal requirements.

2.    Petitioners next point to a West Virginia law requiring a carbon sequestration well permit applicant to have "made a good-faith effort" to obtain the consent of all persons who own pore space relevant to the carbon sequestration project and, if that fails, to at least begin the process of obtaining the remaining pore space interests pursuant to a process run by the Oil and Gas Conservation Commission (separate from WVDEP). Pet. Br. 38-41 (W. Va. Code § 22-11B-4(d)).

First, W. Va. Code § 22-11B-4(d) does not undermine EPA or WVDEP regulations which provide that UIC permits do not convey property rights. *Contra* Pet. Br. 41. As noted *supra*, EPA's UIC permitting regulations provide that the issuance of a UIC permit does not convey any property rights nor does the issuance of a permit authorize any injury to persons nor invasion of other private rights. 40 C.F.R. § 144.35. West Virginia's UIC regulations specify the same limitations. W. Va. Code R. § 47-13-14.16.1; *see also id*. § 14.16.2. Indeed, West Virginia's law requires a carbon sequestration well permit applicant to take steps—outside the carbon sequestration well permitting process and with a separate entity—towards securing the necessary property rights for a viable carbon sequestration project before WVDEP will issue a carbon sequestration well permit. *See* W. Va. Code

§ 22-11B-4(d). A carbon sequestration well permit issued by WVDEP clearly does not convey those property rights.

More broadly, W. Va. Code § 22-11B-4(d) does not undermine any protections to underground sources of drinking water, which is the requisite consideration in assessing whether West Virginia's program is at least as strict as the federal requirements. The state statute does not limit WVDEP's ability to ensure the carbon sequestration well is constructed and operated in a manner that protects underground sources of drinking water.

3. Finally, although Petitioners opaquely assert EPA's inclusion of W. Va. Code § 22-11B-4(d)(4) in the C.F.R. constitutes a "mechanism for the unlawful taking of private property without just compensation," Pet. Br. 41-42, this too is incorrect. By Petitioners' own assertions, the West Virginia statute does not authorize taking without compensation. Instead, as Petitioners themselves recognize, just compensation, if necessary, will be determined by "the West Virginia Oil and Gas Conservation Commission (a seven-member multi-interest panel)." *Id*. at 42. Thus, Petitioners have failed to identify any facial constitutional infirmity in EPA's incorporation of the state statute into its federal regulations. Although Petitioners also question whether West Virginia's law is constitutional under the West Virginia constitution, *id.*, this is irrelevant here. Under the

Supremacy Clause, a state's constitution has no bearing on federal regulations. *See*

*Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005).

**B.      EPA reasonably concluded West Virginia's long-term liability provision was consistent with all federal requirements.**

EPA properly concluded West Virginia's statute addressing long-term liability for carbon storage wells does not render West Virginia's carbon sequestration well program less stringent than federal requirements. When EPA promulgated the carbon sequestration well program regulations in 2010, EPA concluded it does not have authority under the Safe Drinking Water Act to transfer long-term liability for underground carbon storage wells. 75 Fed. Reg. at 77272. But EPA did not foreclose states from considering such measures. JA-[RTC_28].[4]

West Virginia enacted a provision into state law addressing long-term liability for carbon storage wells. W. Va. Code § 22-11B-12. EPA acknowledged stakeholder concerns about this provision when it proposed to approve West Virginia's primacy application, giving the public a chance to weigh in. 89 Fed. Reg. at 93541. EPA explained in detail why this provision is consistent with EPA requirements for carbon sequestration well primacy. JA-[RTC_27-29]. To begin

---

[4] Three States other than West Virginia with approved carbon sequestration well programs—Louisiana, North Dakota, and Wyoming—also have state laws that address long-term liability for carbon storage wells. *See* 89 Fed. Reg. 703 (Jan. 5, 2024); 85 Fed. Reg. 64053 (Oct. 9, 2020); 83 Fed. Reg. 17758 (Apr. 24, 2018); La. Stat. Ann. § 30:1109;  N.D. Cent. Code § 38-22-17; Wyo. Stat. Ann. § 35-11-319.

with, EPA performed a thorough review and comparison of West Virginia's post-injection site care and site closure requirements against the federal requirements and reasonably determined West Virginia's were as stringent. West Virginia imposes extensive post-injection monitoring and closure requirements at the end of a carbon sequestration well's life cycle. JA-[RTC_27-29]. These requirements ensure there will be no endangerment to underground sources of drinking water. Petitioners do not argue otherwise.

Instead, Petitioners argue state programs cannot authorize post-closure liability transfer because EPA cannot do so, and that West Virginia's provision prevents West Virginia from enforcing "post-closure violations" in the federal program. Pet. Br. 44-51. As explained below, neither are true.

1.     Petitioners argue West Virginia's long-term liability provision is less stringent than EPA's regulations because it authorizes a post-closure liability "release" in W. Va. Code § 22-11B-12(e). But, as EPA explained in the record, this provision does not make West Virginia's program any less stringent, does not undermine any protections under the Act, and is limited in nature. JA-[RTC_27-30].

West Virginia regulations require extensive monitoring after injection of carbon dioxide into a well ends. The owner or operator must continue to monitor the area impacted by the project to ensure there is no danger to underground

sources of drinking water. W. Va. Code R. § 47-13-13.9.2. Monitoring must continue for fifty years or for an alternative monitoring period, approved by the state in consultation with EPA, that site-specific data show to be appropriate and that ensures non-endangerment of underground sources of drinking water. *Id*. § 47-13-13.9.3. After this monitoring period has ended, the owner or operator must show no additional monitoring is necessary. *Id*. § 47-13-13.9.2.c. If that showing cannot be made, then the site cannot close, and monitoring must continue. *Id*. § 47-13-13.9.2.d. Only after the owner or operator shows the site does not endanger underground sources of drinking water can the owner or operator plug and close the injection well, and all monitoring wells, consistent with the approved site closure plan. *Id*. § 47-13-13.9.5. The owner or operator must then submit a site closure report to WVDEP, *id*. § 47-13-13.9.6, record a notation on the deed to the relevant property that will in perpetuity provide any potential purchaser with notice of the carbon storage project, *id*. § 47-13-13.9.7, and retain records for 10 years. *Id*. § 47-13-13.9.8. Petitioner does not dispute that these requirements are consistent with the federal requirements, 40 C.F.R. § 146.93.

Only after all these requirements are met may an owner or operator seek a limited transfer to the state of future liability under West Virginia's long-term liability statute. W. Va. Code § 22-11B-12. WVDEP then may issue a Certificate of Underground Carbon Dioxide Storage Project Completion ("completion

certificate") to an operator of a carbon storage facility. *Id.* § 22-11B-12(a). To

obtain the completion certificate, the operator must show: (1) the operator is in full

compliance with all laws and other requirements governing the storage facility, and

has fulfilled all requirements of the UIC permit associated with the facility

including permit requirements related to post-injection site care and site closure;

(2) the operator has addressed all pending claims regarding the storage facility's

operation; and (3) the storage reservoir is reasonably expected to retain the carbon

dioxide stored in it. *Id.* § 22-11B-12(d)(1)-(3). West Virginia's long-term liability

statute thus addresses only whatever liability might arise after the owner or

operator demonstrates the carbon sequestration well will not endanger underground

sources of drinking water and has been closed in compliance with the carbon

sequestration well permit and all applicable regulations.

Importantly, the liability transfer does not extend to any liability arising

from noncompliance with carbon sequestration well-related statutes, regulations, or

permits before the certificate is issued. *Id.* § 22-11B-12(e)(5). The liability transfer

provision also preserves WVDEP's emergency authority related to underground

sources of drinking water because it does not apply if WVDEP determines there is

underground fluid migration that causes or threatens imminent and substantial

endangerment to an underground source of drinking water for which the operator is

responsible. *Id*.; *see also* W. Va. Code R. § 47-13-14.1.6. West Virginia's long-

term liability provision also makes clear that any transfer of liability may not interfere with EPA's Safe Drinking Water Act emergency authority. W. Va. Code § 22-11B-12(g); *see also* 42 U.S.C. § 300i(a); *see also* 40 C.F.R. § 144.12(e).

Additionally, the Memorandum of Agreement addendum between West Virginia and EPA further spells out the process of site closure and conditions upon which the "completion certificate" would be issued. In the Memorandum of Agreement addendum, West Virginia confirmed it would not issue a certificate until a site fully complies with the federal and state site closure requirements, including the final steps of recording a notation on the deed to the facility property and the retention of records for ten years. JA-[MOA_4]. If WVDEP determines at any time, including after the issuance of a certificate of completion, the storage operator is or was not in compliance with all laws and other requirements governing the storage facility, as required by W. Va. Code § 22-11B-12(d)(1), WVDEP may commence an appropriate enforcement action.

Thus, EPA properly determined that the post-closure liability transfer provision does not undermine any protections under the Safe Drinking Water Act. JA-[RTC_30].

2.	Petitioners argue the 2010 Rule establishing provisions for carbon sequestration well programs shows "EPA specifically rejected such [post-closure

liability] releases as beyond the authority Congress gave it when it adopted the federal [carbon sequestration well] regulations." Pet. Br. 45.

At the outset, Petitioners mischaracterize the 2010 Rule. As a part of the 2010 rulemaking, EPA considered a range of comments regarding long-term liability following site closure. 75 Fed. Reg. at 77272. Some of the comments urged EPA to include a provision for liability transfer after site closure to a publicly- or industry-funded entity while other commenters disagreed that a public entity should bear liability such liability. 75 Fed. Reg. at 77271-72. EPA ultimately decided not to promulgate regulations governing long-term liability after site closure in the carbon sequestration well rule. *Id.*; *See also* JA-[RTC_28]. As stated in the preamble, the Act does not grant EPA the authority "to transfer liability from one entity (i.e., owner or operator) to another." 75 Fed. Reg. at 77272. But EPA specifically clarified in its Response to Comments for this action that it was "not interpreting its UIC regulatory requirements as prohibiting primacy states from allowing liability transfer after site closure, but merely noting" the *EPA* does not have the authority from Congress to do so. JA-[RTC_28].

EPA did not conclude in the 2010 rule that states authorizing liability transfer after site closure cannot receive carbon sequestration well primacy. JA-[RTC_28]. That said, as EPA emphasized in its Response to Comments for this action, "such state liability transfer provisions must be appropriately crafted so that

the [s]tate's [carbon sequestration well] program meets UIC regulatory requirements." JA-[RTC_29]. Here, West Virginia's provision is appropriately crafted. For example, as discussed above, the provision forbids transfer of liability resulting from noncompliance before issuance of the completion certificate. W. Va. Code § 22-11B-12(e)(5). Thus, EPA reasonably determined West Virginia's liability transfer provisions were appropriately crafted and the West Virginia program is as stringent as the federal regulations.

3.      Petitioners next argue West Virginia's post-closure liability transfer provision is not compliant with another EPA regulation, 40 C.F.R. § 145.13 (requirements for enforcement authority), because it "releases" owners and operators from liability for post-closure violations that do not involve fluid migration, like record keeping. In Petitioners' theory, West Virginia's law is not compliant with 40 C.F.R. § 145.13 because (they argue) WVDEP would not be able to enforce the record-keeping requirement in EPA's regulation. Pet. Br. 48. Petitioners insist EPA "entirely ignore[d]" these requirements in EPA's response to comments. Pet. Br. 51.

These requirements were not ignored. As EPA explained in its Response to Comments, "A completion certificate issued pursuant to WV Code Section 22-11B-12 cannot release a former operator from any liabilities that arise from noncompliance with UIC regulatory requirements prior to issuance of the

- 47 -

certificate (WV Code Section 22-11B-12(e)(5)).” JA-[RTC_30]. Additionally, EPA's carbon sequestration well regulations, which include the deed recordation and record retention requirements mirrored in the state regulation, do not mention any “post-closure” requirements that might be distinct from “closure” requirements. Both the federal and state record retention requirements, including the one cited by Petitioners, are part of the *closure* requirements that an owner or operator must perform *before* being eligible to receive the completion certificate. *See* W. Va. Code § 22-11B-12(a), (d)(1); *see also* JA-[MOA_4].

### C. Petitioners misunderstand the impact of incorporating a state's statutes and regulations by reference.

Lastly, Petitioners argue EPA attempted a “sleight of hand” regarding the provisions of West Virginia law that Petitioners take issue with by not incorporating them by reference into the federal regulations. Pet. Br. 20-21. During the comment period, some commenters raised concerns with certain provisions of West Virginia law, including the property law and long-term liability provisions Petitioners take issue with. JA-[RTC_11-12]. EPA then reviewed these provisions and reasonably determined none of them needed to be incorporated by reference because some were entirely outside the scope of the UIC program (like the property law provision) and none included carbon sequestration well requirements applicable to owners or operators of carbon sequestration well that the EPA might enforce (like the liability transfer provision). JA-[RTC_11-12].

EPA incorporates by reference a state's regulatory provision that contain requirements applicable to owners or operators of UIC wells primarily so that EPA, in addition to the state, can federally enforce those provisions and all permit conditions imposed pursuant to such regulations. *See* 40 C.F.R. § 147.1(e); *see also* 42 U.S.C. § 300h-2(a); see also JA-[RTC_11-12]. As EPA explained, EPA proposed to incorporate each chapter of West Virginia's statutes and regulations concerning the carbon sequestration well program for the sake of simplicity and to ensure EPA did not miss a provision which EPA might enforce. JA-[RTC_11]. The fact that EPA did not incorporate West Virginia's property laws or long-term liability laws into the federal regulations demonstrates nothing more than what has been previously discussed in this Section: although the state can enforce those provisions of state law, EPA cannot.

**IV.     EPA reasonably concluded WVDEP will effectively and lawfully implement its regulatory program.**

EPA fully considered all record evidence and reasonably determined WVDEP would lawfully and effectively implement a carbon sequestration well program that meets the minimum requirements under the Act.

Petitioners identify no error in EPA's consideration; they simply disagree with the decision. Petitioners argue EPA should have disapproved WVDEP's

carbon sequestration primacy application on the basis of alleged flaws with state regulatory programs other than the carbon sequestration well program—in particular with their Surface Mining Control and Reclamation Act bonding program, and the Office of Oil and Gas's administration of two of its programs. Pet. Br. 24. As discussed in turn below, Petitioners' arguments fail. EPA considered Petitioners' comments and reasonably determined they did not undermine the demonstration in WVDEP's primacy application that WVDEP will effectively implement its carbon sequestration well program.

### A. EPA fully considered WDVEP's Surface Mining Control and Reclamation Act bonding program.

EPA properly determined West Virginia's administration of the Surface Mining Control and Reclamation Act bonding program did not undermine the ample evidence demonstrating that WVDEP will effectively implement the carbon sequestration well program.

To be approved for carbon sequestration well primacy, a state must have financial responsibility provisions at least as stringent as EPA's provisions. 40 C.F.R. § 146.85. Here, Petitioners do not dispute that WVDEP's financial responsibility provisions are at least as stringent as EPA's. JA-[RTC_25]; *see* Pet. Br. 28. EPA reasonably determined that WVDEP demonstrated it will effectively implement the financial responsibility provisions of its carbon sequestration program and that its staff had adequate experience to ensure

operators secured and maintained financial responsibility. JA-[RTC_25]. In addition, EPA will continue to provide support to West Virginia in this area. JA-[RTC_25].

Petitioners argue that because bonding program under the Surface Mining Control and Reclamation Act is allegedly insolvent, WVDEP cannot properly administer the financial responsibility requirements for a carbon sequestration well program. Pet. Br. 25. But EPA weighed these concerns against stronger evidence in the record supporting EPA's determination that WVDEP will administer the carbon sequestration well financial responsibility requirements in conformance with its regulatory requirements. JA-[RTC_25].

Specifically, EPA explained that the financial responsibility program under the Surface Mining Control and Reclamation Act is run by an entirely different division of WVDEP than would be overseeing the carbon sequestration well program and that EPA does not oversee that program. JA-[RTC_25]. EPA then pointed to the relevant WVDEP's staff's financial expertise and commitment to oversight, and West Virginia's regulations requiring owners or operators of carbon sequestration wells to demonstrate and maintain adequate financial resources to perform all site care requirements. JA-[RTC_25]. Thus, EPA reasonably found that concerns regarding the bonding program under Surface Mining Control and Reclamation Act did not outweigh the evidence in the record

supporting the conclusion that WVDEP will administer the carbon sequestration well financial responsibility in conformance with its detailed regulatory requirements for financial responsibility, which are as stringent as EPA's requirements. JA-[RTC_25].

Petitioners cite two cases to support the asserted relevance of the Surface Mining Control and Reclamation Act: *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581 (4th Cir. 2012) and *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487 (4th Cir. 2023). Neither are applicable to Petitioners' argument in this case because both concern an agency's failure to meaningfully consider historic noncompliance pertaining directly to the factors the agency was required to consider. In *Friends of Back Bay*, the Court found an agency's primary reliance on a regulation to make its determination was arbitrary and capricious because that specific regulation had a five-year history of not being enforced in the particular area at issue. *Friends of Back Bay*, 681 F.3d. at 588-89. Similarly, in *W. Va. Dep't of Env't Prot.*, when issuing a Clean Water Act certification, West Virginia's regulations required WVDEP to consider a permit applicant's history of noncompliance with its Clean Water Act permits. *W. Va. Dep't of Env't Prot.*, 64 F.4th at 502. The Court found WVDEP acted arbitrarily and capriciously when it failed to adequately grapple with the specific permit applicant's history of non-

compliance under a certain permit, but assumed future compliance with the same permit. *Id*. at 502-05.

Here, the Surface Mining Control and Reclamation Act has no bearing on WVDEP's carbon sequestration well program because it is an entirely different program overseen by a different federal regulator. JA-[RTC_25]. There is no history of WVDEP running its carbon sequestration well financial responsibility provisions and nothing in the record indicating WVDEP mismanagement of its other UIC financial responsibility provisions. Notably, there is no requirement for EPA to consider a state's performance of *other* state programs when determining whether the state has adequately supported its application for UIC primacy. EPA rightly focused on WVDEP's planned implementation of the new carbon sequestration well program, including the safeguards EPA built into its approval to oversee the program. JA-[RTC_21-22]. In the face of evidence specific to WVDEP's carbon sequestration program and the elements of West Virginia's primacy application that EPA considers under 40 C.F.R. § 145.32(b)(1), as well as the public comments received, EPA reasonably determined the alleged issues with the Surface Mining Control and Reclamation Act bonding program raised in public comments did not undermine WVDEP's demonstration that it will administer carbon sequestration well program financial responsibility provisions in conformance with applicable requirements.

**B.    EPA fully considered WVDEP's Office of Oil and Gas's management of its programs.**

EPA reasonably determined WVDEP's proposed carbon sequestration well program will have the capacity to perform inspections and enforce the carbon sequestration well regulations and permits. JA-[RTC_21-22]. Contrary to Petitioners' assertion, Pet. Br. 30-35, the record confirms EPA fully considered and responded to comments regarding West Virginia's Office and Oil and Gas's management of the Class II UIC program and the oil and gas production wells.

As discussed *supra*, WVDEP's Office of Oil and Gas manages all actions related to the exploration, drilling, storage, and production of oil and natural gas, including oversight of abandoned and orphaned oil and gas production wells, as well as management of the Class II UIC program. *See* W. Va. Code § 22-6-1 et seq.

Notably, WVDEP's Class II program is implemented by a different office (Office of Oil and Gas) than the carbon sequestration well program (Division of Water and Waste Management) and is subject to a different standard under the Safe Drinking Water Act compared to the standard applicable to a carbon sequestration well primacy application. 42 U.S.C. § 300h-4(a). The Class II standard leaves more discretion to the state regarding how to develop and

implement a Class II program. Guidance #19, Section 1.0. For these reasons, WVDEP's Class II implementation is not an apt tool to forecast WVDEP's future implementation of the carbon sequestration well program. Nevertheless, EPA did consider it.

Petitioners make two arguments related to the Office of Oil and Gas. First, Petitioners assert the Office of Oil and Gas's allegedly "lax" oversight of the Class II UIC program required EPA to disapprove WVDEP's carbon sequestration well primacy application. Pet. Br. 30-32. Second, Petitioners argue that how the Office of Oil and Gas manages abandoned and orphaned oil and gas wells "fatally undermines EPA's prediction that West Virginia will effectively implement its [carbon sequestration well] Program." Pet. Br. 33.

First, with respect to enforcement concerns raised regarding the Class II program, EPA reasonably found the public comments about WVDEP's allegedly lax oversight of Class II wells did not undermine the evidence in the record supporting the authority and capacity of WVDEP to effectively implement the UIC carbon sequestration well program. As discussed in detail *supra*, EPA found WVDEP provided considerable evidence demonstrating its capacity to effectively oversee and enforce the carbon sequestration well program in the Program Description and Memorandum of Agreement addendum, including the compliance monitoring strategy, its enforcement procedures, and its inspection strategy. JA-

[RTC_24]. Moreover, EPA implemented safeguards in the carbon sequestration well program through which EPA will continue to monitor WVDEP's implementation of this program.

Contrary to Petitioners' claims, EPA fully "grapple[d] with" a 2019 report by an environmental advocacy group raised by commenters that found fault with WVDEP's administration of the Class II program and enforcement of Class II permits and did not focus "almost exclusively" on WVDEP's program description and capacity. Pet. Br. 30-31. EPA considered the Class II enforcement-related comments and evaluated its own data regarding WVDEP's Class II enforcement. JA-[RTC_22-25]. Specifically, EPA reviewed inspection data reported by West Virginia from fiscal years 2020 to 2024 and found that WVDEP inspected an average of 343 Class II UIC wells per year and witnessed an average of 43 mechanical integrity tests per year. JA-[RTC_23-24]. Further, EPA's yearly evaluation of WVDEP's Class II well program has shown that WVDEP generally meets or exceeds its annual grant workplan commitments, including those related to compliance assurance and enforcement. JA-[RTC_23-24]. For example, EPA's 2022 report explained that during its oversight of the Class II program, WVDEP's Office of Oil and Gas uncovered thirteen Class II wells with violations and issued one operator a formal notice of violations for failing a mechanical integrity test. JA-[2022_Grant_Workplan_Review_Report_5]. The failed well was then brought

back into compliance and all other violations at other wells were corrected. JA-[2022_Grant_Workplan_Review_Report_5]. In both its 2022 and 2023 reports, EPA commended WVDEP's Office of Oil and Gas "for pursuing compliance against 100% of facilities that were found to be in violations of their permit and SDWA regulations." JA-[2022_Grant_Workplan_Review_Report_5]; JA-[2023_Grant_Workplan_Review_Report_5]. Thus, the totality of evidence before the EPA demonstrated WVDEP was appropriately implementing its Class II program.

Ultimately, EPA reasonably concluded the information provided in the comments did not undermine the record demonstrating WVDEP's enforcement adequacy and that WVDEP will effectively and lawfully implement the carbon sequestration well program. JA-[RTC_24].

Second, Petitioners argue EPA failed to consider West Virginia's Office of Oil and Gas's purported mismanagement of programs *unrelated* to UIC wells. Pet. Br. 34-35. But comments regarding programs unrelated to the UIC program are beyond the scope of the rulemaking. It is a basic tenet of administrative law that agencies have no obligation to respond to comments outside the scope of a rulemaking. *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997) (agency was not required to respond to the merits of comments where the comment was beyond the scope of the rulemaking); *see also*

*South Carolina ex rel. Tindal v. Block*, 717 F.2d 874, 886 (4th Cir. 1983) (agency was only required to respond to the comments concerning the major factors relevant to the decision and was not required to respond to comments outside of the scope or irrelevant to the rulemaking). And here, Petitioners expressly acknowledge EPA addressed commenter concerns about abandoned or orphaned gas and oil wells that were actually related to WVDEP's ability to implement its carbon sequestration well program. Pet. Br. 34-35; JA-[RTC_37]. EPA agreed that orphaned oil and gas production wells are a concern and explained how WVDEP's corrective action requirements will fix any unplugged or improperly plugged wells within the area of review of a carbon sequestration well. JA-[RTC_37]. Additionally, and as explained *supra*, the Office of Oil and Gas is not the West Virginia office charged with managing the carbon sequestration well program. Thus, EPA properly determined concerns about its efficacy *unrelated* to the UIC program were outside the scope of the rulemaking. JA-[RTC_37].

Lastly, Petitioners mischaracterize EPA's response to comments when they assert EPA "admitted" West Virginia "improperly" allows new mineral drilling through a CO2 site. Pet. Br. 34. EPA's statement was characterizing public comments, not EPA's response. Moreover, Petitioners do not explain how the presence of such a provision demonstrates WVDEP cannot effectively implement the carbon sequestration well program such that EPA's decision was arbitrary and

capricious. *Id*. EPA thoroughly explained in the record the reasons why this provision of West Virginia law does not conflict with or undercut any federal UIC regulation or requirement for UIC primacy. JA-[RTC_18-21].

Ultimately, Petitioners' issue is not that EPA failed to consider all the evidence, but that EPA did not come to the same conclusion as Petitioners. But this Court's role is *not* to supplant its reasoning for that of the Agency's. *Prometheus Radio Project*, 592 U.S. at 423. Instead, this Court can only consider whether EPA considered all relevant evidence and came to a rational conclusion. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Here, EPA did just that. EPA weighed the examples raised by Petitioners regarding the administration of non-carbon sequestration well programs against the record evidence described *supra* that supports the conclusion that WVDEP will effectively implement the carbon sequestration well program. After considering all these factors, EPA reasonably determined that the evidence provided by commenters did not undermine West Virginia's primacy application.

## CONCLUSION

The petition should be denied.

Respectfully submitted,

Dated: April 1, 2026

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

CONNER R. HUGGINS
Of Counsel:

CATHERINE CHONG
ALEC MULLEE
U.S. Environmental Protection
Agency

Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7411
Washington, D.C. 20044
(202) 598-3799
Conner.huggins@usdoj.gov

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the word limit in Federal Rule of

Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document

exempted by Rule 32(f), this document contains 12,982 words.

2.      This document complies with the requirements of Federal Rule of

Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point

Times New Roman, a proportionally spaced font on Microsoft Word.


 DATED: April 1, 2026                              */s/ Conner R. Huggins*

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 1, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

DATED: April 1, 2026                    */s/ Conner R. Huggins*